**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 21-1478

WILLIAM PARKER GAREY; AARON KENT CRUTHIS; JUSTIN BRENT BLAKESLEE; ADILAH HANEEFAH-KHADI MCNEIL; CHARLOTTE MOFFAT CLEVENGER; BELINDA LEE STEINMETZ, on behalf of themselves and others similarly situated,

        Plaintiffs – Appellants,

    v.

JAMES S. FARRIN, P.C., d/b/a Law Offices of James Scott Farrin; MARCARI, RUSSOTTO, SPENCER & BALABAN, P.C.; RIDDLE & BRANTLEY, L.L.P.; WALLACE PIERCE LAW, PLLC; R. BRADLEY VAN LANINGHAM; LANIER LAW GROUP, P.A.; JAMES S. FARRIN; DONALD W. MARCARI; SEAN A. COLE; JARED PIERCE; VAN LANINGHAM & ASSOCIATES, PLLC, d/b/a Bradley Law Group; LISA LANIER; CHRIS ROBERTS; CRUMLEY ROBERTS, LLP; HARDISON & COCHRAN, PLLC; BENJAMIN T. COCHRAN; TED A. GREVE & ASSOCIATES, P.A.; TED A. GREVE; LAW OFFICES OF MICHAEL A. DEMAYO, L.L.P.; MICHAEL A. DEMAYO; HARDEE & HARDEE, LLP; CHARLES HARDEE; G. WAYNE HARDEE; KATHERINE E. ANDREWS-LANIER,

        Defendants – Appellees,

    and

UNITED STATES OF AMERICA,

        Intervenor.

No. 21-1480

JOHNATHAN HATCH; MARK F. DVORSKY; KELLY EPPERSON,

        Plaintiffs – Appellants,

  and

SHATERIKA NICHOLSON,

        Plaintiff,

    v.

MICHAEL A. DEMAYO; LAW OFFICES OF MICHAEL A. DEMAYO, L.L.P; THE LAW OFFICES OF MICHAEL A. DEMAYO, P.C.; JASON E. TAYLOR; LAW OFFICES OF JASON E. TAYLOR, P.C.; BENJAMIN T. COCHRAN; HARDISON & COCHRAN, PLLC; CARL B. NAGLE; NAGLE & ASSOCIATES, P.A.; JOHN J. GELSHENEN, JR.; DAVIS & GELSHENEN, LLP; MARK I. FARBMAN; MARK FARBMAN, P.A.; TED A. GREVE; TED A. GREVE & ASSOCIATES, P.A.; CHRISTOPHER THOMAS MAY; ESTWANIK ANY MAY, P.L.L.C.,

        Defendants – Appellees,

UNITED STATES OF AMERICA,

        Intervenor,

  and

MICHAEL J. LEWIS; LEWIS & ASSOCIATES ATTORNEYS AT LAW, P.A.; THOMAS KREGER,

        Defendants.

2

Appeals from the United States District Court for the Middle District of North Carolina, at Greensboro. Loretta C. Biggs, District Judge. (1:16-cv-00542-LCB-LPA; 1:16-cv-00925-LCB-LPA)

---

Argued: May 3, 2022                                    Decided: June 3, 2022

---

Before WILKINSON, MOTZ, and THACKER, Circuit Judges.

---

Affirmed by published opinion. Judge Motz wrote the opinion, in which Judge Wilkinson and Judge Thacker joined.

---

**ARGUED:** J. David Stradley, WHITE & STRADLEY, LLP, Raleigh, North Carolina, for Appellants. Matthew Nis Leerberg, FOX ROTHSCHILD LLP, Raleigh, North Carolina, for Appellees. Amanda Mundell, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Intervenor. **ON BRIEF:** Robert P. Holmes, IV, WHITE & STRADLEY, LLP, Raleigh, North Carolina; John F. Bloss HIGGINS BENJAMIN, PLLC, Greensboro, North Carolina, for Appellants. Reid C. Adams, Jr., Jonathan R. Reich, WOMBLE BOND DICKINSON (US) LLP, Winston-Salem, North Carolina; Bradley M. Risinger, Troy D. Shelton, Jeffrey R. Whitley, FOX ROTHSCHILD LLP, Raleigh, North Carolina; Harold C. Spears, CAUDLE & SPEARS, P.A., Charlotte, North Carolina; David Coats, BAILEY & DIXON, Raleigh, North Carolina, for Appellees. Brian M. Boynton, Acting Assistant Attorney General, Mark B. Stern, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Intervenor.

---

3

DIANA GRIBBON MOTZ, Circuit Judge:

The Defendants here, a number of personal injury lawyers, obtained car accident reports from North Carolina law enforcement agencies and private data brokers. The reports included the names and addresses of the drivers involved in those accidents. The Defendants used that personal information to mail unsolicited attorney advertising materials to some of the drivers. Two groups of the drivers who received these materials, the Plaintiffs here, filed suit, asserting that the Defendants violated the Driver's Privacy Protection Act ("DPPA"). That statute provides a private cause of action against "[a] person who knowingly obtains, discloses or uses personal information, from a motor vehicle record," for an impermissible purpose. *See* 18 U.S.C. § 2724(a). The district court held that the Plaintiffs had standing to bring suit for damages, but rejected the Plaintiffs' claims on the merits, granting summary judgment to the Defendants in both cases. We affirm, albeit on narrower grounds than those on which the district court relied.

## I.

Despite the voluminous[1] record in these consolidated cases, the relevant facts are uncontested. When law enforcement officers respond to a car crash in North Carolina, they generate an account of the accident on a standardized form. The form includes the type of

---

[1] The Joint Appendices in these cases run over 13,000 pages, of which only a few hundred are necessary to dispose of this appeal. We gently remind litigants that the Federal Rules of Appellate Procedure provide that parties should include in a joint appendix "the *relevant* docket entries in the proceeding below," "the *relevant* portions of the pleadings, . . . findings, or opinion," and limited other documents helpful to the resolution of an appeal. Fed. R. App. P. 30(a)(1) (emphasis added); *see also* Theodore Seuss Geissel, *The Lorax* 23 (1971) ("I speak for the trees, for the trees have no tongues.").

4

information one might expect:  the time and location of the accident, the make and model of the involved vehicles, a description of any injuries, a brief narrative of the crash, and so on.  Crucially, the form also includes the names and home addresses of the drivers. Underneath the address field in the form is the text: "Same Address on Driver's License?" followed by "Yes" or "No" checkboxes.  Law enforcement agencies store these accident reports,[2] which are public records under North Carolina law.  *See* N.C. Gen. Stat. § 20-166.1(i) ("The [accident] reports made by law enforcement officers . . . are public records and are open to inspection by the general public.").  In addition, some private data brokers obtain and sell these accident reports.

The Defendants are attorneys who wish to represent people involved in car crashes in North Carolina.  They obtained accident reports from North Carolina law enforcement agencies or private data brokers and used the names and addresses on the reports to mail unsolicited attorney advertising materials to the drivers involved in those crashes.  Two groups of drivers who received such mailings — the Plaintiffs here — sued, invoking § 2724(a) of the DPPA.  That statute provides:

> A person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains, who may bring a civil action in a United States district court.

§ 2724(a).  Both groups of Plaintiffs sought monetary damages and injunctive relief, and one group also sought a declaratory judgment.

---

[2] Although somewhat confusingly labelled as a "DMV-349," the standardized form is neither created nor stored by the North Carolina Department of Motor Vehicles. Therefore, for clarity's sake, we refer to this form as an "accident report."

5

After a flurry of motions and amended complaints, the district court denied the Defendants' motions to dismiss the damages claims for lack of standing but granted those motions insofar as the Plaintiffs sought injunctive relief. Ultimately, the district court ruled for the Defendants on cross-motions for summary judgment. The court reasoned that the DPPA applies only to persons who obtain personal information directly from a state DMV. Here, the court noted, the "Defendants either obtained these reports directly from a local law enforcement office or they subscribed to third-party services that aggregated crash records." Because the Defendants never obtained records from a DMV, the court concluded that their "conduct thus falls outside the ambit of the DPPA, and they are entitled to judgment as a matter of law."

The Plaintiffs then appealed. Because the *Hatch* and *Garey* cases present substantively identical legal questions (with a few minor exceptions noted herein), we consolidated them for appeal. We now affirm.

## II.

The Defendants challenge the Plaintiffs' standing to seek monetary and injunctive relief. The district court held that the Plaintiffs had standing to pursue damages but lacked standing to obtain an injunction. Because "[s]tanding 'is a threshold jurisdictional question,'" we address it first. *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 343 (4th Cir. 2017) (quoting *Pye v. United States*, 269 F.3d 459, 466 (4th Cir. 2001)). Our review of standing questions is de novo. *Wikimedia Found. v. NSA*, 857 F.3d 193, 207 (4th Cir. 2017).

6

A.

Plaintiffs who do not have a legally cognizable injury lack standing to bring suit in federal court.[3]  Congress may, of course, "elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 578 (1992).  But as the Defendants correctly point out, plaintiffs cannot establish a cognizable injury simply by pleading a statutory violation.  *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016) ("Article III standing requires a concrete injury even in the context of a statutory violation.").

Balancing these two rules has in the past caused some confusion, but the Supreme Court recently clarified when a statutory cause of action identifies an injury sufficient for standing purposes.  In *TransUnion LLC v. Ramirez*, the Court explained that plaintiffs proceeding under a statutory cause of action can establish a cognizable injury by "identif[ying] a close historical or common-law analogue for their asserted injury" for which courts have "traditionally" provided a remedy.  141 S. Ct. 2190, 2204 (2021) (citing *Spokeo*, 578 U.S. at 341).  A plaintiff who does so has standing even if the precise injury would not, absent the statute, be sufficient for Article III standing purposes.

Consistent with *TransUnion*, the district court here found standing because "[p]laintiffs' alleged harms are closely related to the invasion of privacy, which has long provided a basis for recovery at common law."  We agree.  Indeed, following *Spokeo* and foreshadowing *TransUnion*, we recently rebuffed a nearly identical standing challenge in

---

[3] The other two standing requirements are causation and redressability.  *See Lujan*, 504 U.S. at 560–61.  Only the presence of a legally cognizable injury is at issue in this case.

a case arising under the Telephone Consumer Protection Act ("TCPA"), another consumer privacy statute that, like the DPPA, provides a private right of action against offenders. *See Krakauer v. Dish Network, LLC*, 925 F.3d 643, 652–54 (4th Cir. 2019).

In *Krakauer*, we explained that by enacting the TCPA, "Congress responded to the harms of actual people by creating a cause of action that protects their particular and concrete privacy interests." *Id.* at 653. And we noted that injuries to personal privacy have long been "recognized in tort law and redressable through private litigation." *Id.* We acknowledged that although the TCPA provides claims that differ from common law privacy torts, *Spokeo* does not require us to "import the elements of common law torts, piece by piece, into any scheme Congress may devise." *Id.* Rather, we concluded that our inquiry "focuse[s] on types of harms protected at common law, not the precise point at which those harms become actionable." *Id.* at 654. Therefore, we held that the TCPA's "private right of action . . . plainly satisfies the demands of Article III." *Id.* at 653.

Applying the same analysis as *Krakauer*, we reach the same result. The Plaintiffs have alleged a legally cognizable privacy injury. *See, e.g.*, *Garey* Second Am. Compl. ¶ 127 ("[E]ach [Plaintiff] sustained actual damages by having his or her privacy invaded by Defendants' knowingly obtaining his or her name and address from a motor vehicle record for an impermissible purpose in violation of law."). The Defendants point out some differences between the common law privacy torts and the DPPA, but our inquiry "does not require an exact duplicate in American history and tradition." *TransUnion*, 141 S. Ct. at 2204. At bottom, the DPPA is aimed squarely at "the right of the plaintiff, in the phrase coined by Judge Cooley, 'to be let alone.'" William L. Prosser, *Privacy*, 48 CALIF. L. REV.

8

383, 389 (1960) (footnote omitted). *See generally* Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 HARV. L. REV. 193 (1890). Therefore, the Plaintiffs have Article III standing to pursue claims for damages.[4]

B.

Our holding that the Plaintiffs have standing to seek damages does not end our inquiry, because "a plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000). Here, the Plaintiffs seek injunctive relief in addition to damages. "[A] plaintiff can 'satisfy the injury-in-fact requirement for prospective relief' either by demonstrating 'a sufficiently imminent injury in fact' or by demonstrating 'an ongoing injury' . . . ." *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 189 (4th Cir. 2018) (quoting *Kenny v. Wilson*, 885 F.3d 280, 288 (4th Cir. 2018)).

The district court rejected the *Garey* Plaintiffs' request for injunctive relief on standing grounds because "[t]here is no showing either in the Second Amended Complaint or in Plaintiffs' Response to [the] Motion to Dismiss that [the named] plaintiffs are subject to any imminent harm." Similarly, the court rejected the *Hatch* Plaintiffs' request for an injunction because "[t]here is no . . . showing either in the Second Amended Complaint or in Plaintiffs' [response to the motion to dismiss] that any of the three plaintiffs are subject

---

[4] The DPPA provides for liquidated damages of $2,500 if a plaintiff cannot prove actual damages greater than that amount. § 2724(b)(1). *See Kehoe v. Fidelity Fed. Bank & Tr.*, 421 F.3d 1209, 1213 (11th Cir. 2005) ("Since liquidated damages are an appropriate substitute for the potentially uncertain and unmeasurable actual damages of a privacy violation, it follows that proof of actual damages is not necessary for an award of liquidated damages [under the DPPA]."). The Defendants do not contend otherwise.

to any 'imminent' or 'certainly impending' harm." Once again, we agree with the district court. However, because this is one of the rare instances in which these consolidated cases diverge slightly, we discuss them separately.

1.

The *Garey* Plaintiffs protest that at the time they commenced this action, the Defendants "were unlawfully *using* DPPA-protected information in connection with their mail solicitation efforts." *Garey* Pls'. Br. at 33 (emphasis added). To be sure, the DPPA imposes liability on one "who knowingly obtains, discloses *or uses* personal information." § 2724(a) (emphasis added). But the operative document here is the Second Amended Complaint. And in seeking leave to file that complaint, the *Garey* Plaintiffs made clear that their proposed amendments would "streamline the action" by eschewing a "use" or "disclosure" theory and focusing "only [on] the Defendants' *obtaining* of Plaintiffs' personal information." The district court granted them leave to amend. Having amended their complaint to jettison a "use" theory of DPPA liability and bring only an "obtaining" claim, the *Garey* Plaintiffs cannot now seek standing based on the "use" of their personal information.

Instead, having narrowed their case to "obtaining," the *Garey* Plaintiffs must allege that the Defendants are currently *obtaining* their personal information or will do so imminently, unless they receive injunctive relief. But under their theory of the case, the obtaining of their personal information is a *fait accompli*; the *Garey* Plaintiffs were already in car accidents, and the Defendants already obtained the relevant accident reports. That is enough for retrospective monetary relief, but it does not establish an ongoing or

10

imminent injury. A future "obtaining" violation would only occur if a Plaintiff is involved in a future car accident in North Carolina, if law enforcement generates another crash report, and if the Defendants obtain that hypothetical report. But that mere possibility is hardly the kind of non-speculative, imminent danger that can support injunctive relief. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983) ("[P]ast wrongs do not in themselves amount to that real and immediate threat of injury necessary to [obtain prospective remedies]."). Therefore, we affirm the district court's dismissal of the *Garey* Plaintiffs' request for injunctive relief for lack of standing.

2.

The *Hatch* Plaintiffs' standing to seek injunctive relief presents a slightly different story, although the ending is the same.[5] Unlike the *Garey* Plaintiffs, the *Hatch* Second Amended Complaint (the operative complaint) did not disavow a "use" theory of liability. Indeed, the operative *Hatch* complaint plainly alleges that the "Defendants knowingly obtained *and used* one or more Plaintiff's protected personal information from a motor vehicle record." Thus, although the *Hatch* Plaintiffs lack standing for injunctive relief under an "obtaining" theory for the same reasons as the *Garey* Plaintiffs, the *Hatch* Plaintiffs (unlike the *Garey* Plaintiffs) might establish standing for injunctive relief against the ongoing or future *use* of their previously obtained personal information.

---

[5] Because we conclude that the *Hatch* Plaintiffs lack standing to seek injunctive relief, they also lack standing to seek a prospective declaratory judgment. *See Kenny*, 885 F.3d at 287–88 (explaining that the standing analysis for prospective relief applies both to injunctive and declaratory remedies). The *Garey* Plaintiffs did not request declaratory relief. *See Garey* Second Am. Compl. at 65–66.

To do so, however, the *Hatch* Plaintiffs would have to allege that at the time of the operative complaint, the Defendants were using their personal information or were about to do so. *See Deal*, 911 F.3d at 189. But the operative complaint alleges only that the Defendants "used" — past tense — the Plaintiffs' information to send them unsolicited mailings. *See, e.g.*, *Hatch* Second Am. Compl. ¶ 83 ("Each Defendant knowingly obtained *and used* one or more Plaintiff's protected personal information . . . for the purpose of marketing that Defendant's legal services." (emphasis added)); ¶ 90 ("[T]he named Plaintiffs . . . *have suffered* damage to their respective privacy rights . . . when personal information from a motor vehicle record . . . *was* obtained, disclosed *or used* by Defendants without consent or permission. Such acts and conduct *constituted* an invasion of a legally protected interest . . . ." (emphasis added)).

To be sure, as the *Hatch* Plaintiffs note, *see Hatch* Pls'. Br. at 27–28, they also alleged that the "Defendants regularly and knowingly obtain and use personal information from motor vehicle records for purposes of marketing their services," *Hatch* Second Am. Compl. ¶ 89, and that some Defendants kept sending mailings like those sent to the named Plaintiffs even after this case commenced. *Id.* ¶ 80. But there is no allegation that the *Plaintiffs* were continuing to receive such mailings at the time of the operative complaint, nor that they are imminently likely to receive such mailings in the future. Instead, the allegations of ongoing conduct relate to the Defendants' practices *in general*, rather than specifically in connection with the named Plaintiffs. Thus, because the *Hatch* Plaintiffs (and, for that matter, the *Garey* Plaintiffs) have not alleged an ongoing or imminent

12

"obtaining" or "use" violation vis-à-vis their own personal information,[6] the district court properly dismissed their request for injunctive relief.

## III.

We turn to the merits. On cross-motions for summary judgment, the district court ruled for the Defendants and against the Plaintiffs. We review such rulings de novo. *Young v. Equinor USA Onshore Props., Inc.*, 982 F.3d 201, 205 (4th Cir. 2020).

The parties seek to present several complex questions of first impression in this Circuit, including whether a driver's license is a "motor vehicle record," whether the DPPA applies to records outside the possession of a state DMV, and whether the DPPA's restrictions on the obtaining, use, and dissemination of records impinge on the First Amendment. But those questions must be answered another day, for we affirm the district court on the following, much narrower ground.

To be civilly liable under the DPPA, a defendant must have obtained a plaintiff's personal information "*from* a motor vehicle record." § 2724(a) (emphasis added). But the Plaintiffs do not allege that the Defendants obtained any of the Plaintiffs' personal information "*from*" any of the sources that they argue constitute "motor vehicle record[s]." *Id.* (emphasis added). Thus, even assuming for the sake of argument that everything the

---

[6] The Plaintiffs' failure to allege that they personally were facing an ongoing or imminent injury may make sense in the context of a class action. *Cf. Gratz v. Bollinger*, 539 U.S. 244, 260–68 (2003) (discussing class representative's standing to seek injunctive relief on behalf of class members not identically situated). But the district court denied class certification, a decision that the Plaintiffs do not now contest and did not previously seek to appeal on an interlocutory basis pursuant to Federal Rule of Civil Procedure 23(f).

Plaintiffs consider to be a "motor vehicle record" is, in fact, a "motor vehicle record," the Plaintiffs cannot prevail.

We begin with the statutory text. The DPPA provides a cause of action against "[a] person who knowingly obtains, discloses or uses personal information, *from* a motor vehicle record, for a purpose not permitted under this chapter . . . ." *Id.* (emphasis added). The next section of the statute defines a "motor vehicle record" as "any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles." *Id.* § 2725(1).

The parties spend a good deal of time arguing over what this definition of a "motor vehicle record" under § 2725(1) might include.[7] But we think this case can be more easily resolved on the basis of a simpler statutory term found in § 2724(a), *i.e.*, "from." To illustrate why, we turn to each of the items Plaintiffs contend is a "motor vehicle record," and ask whether the Defendants obtained any personal information "from" those records.

A.

The Plaintiffs' primary contention is that a driver's license is a motor vehicle record. *See Garey* Pls'. Br. at 36–41; *Hatch* Pls'. Br. at 31–35. Courts are divided on this question. Some courts, reasoning from the structure of the DPPA, have held that a "motor vehicle record" refers only to records held by a state DMV; under that reading of the text, because

---

[7] As for the other elements of § 2724(a)'s cause of action, there is no question that attorney solicitation is a "purpose not permitted under this chapter," s*ee Maracich v. Spears*, 570 U.S. 48, 76 (2013) ("Solicitation of prospective clients is not a permissible use . . . under . . . the DPPA."), nor that protected "personal information" includes "an individual's . . . name, [or] address." *See* § 2725(3).

14

a license is possessed by an individual driver rather than the DMV, it cannot be a "motor vehicle record." *See, e.g.*, *Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1259–60 (9th Cir. 2019). Another widely cited opinion focuses on the wording of the statutory definition of a "motor vehicle record" to conclude that "[a] driver's license [does not pertain to] a motor vehicle operator's permit; it *is* a motor vehicle operator's permit." *Whitaker v. Appriss, Inc.*, 266 F. Supp. 3d 1103, 1108 (N.D. Ind. 2017). Still others have reached the opposite result, reasoning that nothing in the statutory text limits "motor vehicle record[s]" to records held by a state DMV and "that the use of the phrase 'pertains to' is meant to *expand* the scope of the Act's coverage, so that a driver's information is protected not just with respect to a small list of the most obvious motor vehicle records, but any related records as well." *Eggen v. WESTconsin Credit Union*, 2016 WL 4382773, No. 14 Civ. 873, at *3 (W.D. Wis. Aug. 16, 2016); *see also Wilcox v. Swapp*, 360 F. Supp. 3d 1140, 1145–46 (E.D. Wa. 2019).

We need take no position on this debate, because whether or not a driver's license is a "motor vehicle record," it is undisputed that none of the Defendants obtained any information "from" a driver's license.[8]

---

[8] We note, however, that the Plaintiffs' interpretation might well lead to absurd results. For example, the statutory text would not appear to protect a defendant who obtains a plaintiff's personal information from a motor vehicle record with the implicit or verbal consent of that plaintiff. *See Whitaker*, 266 F. Supp. 3d at 1110. So if a driver's license is a "motor vehicle record," a bartender who looks at a patron's proffered license to verify that the patron is old enough to drink alcohol could be sued for liquidated damages of $2,500 plus attorney's fees and costs. *See* § 2724(b) (outlining remedies available under the DPPA). We think Congress might be surprised to learn that it had enacted such a sweeping change in the (night)life of the nation.

15

B.

The Plaintiffs alternatively argue that even if the Defendants did not obtain their personal information from a license, "the *information* came from . . . a driver's license," because the crash report's address field indicates whether the address is the same as that on the license. *Garey* Pls'. Br. at 35 (emphasis added). As a matter of statutory plain meaning, we are skeptical. The phrase "obtain, disclose or use personal information, from a motor vehicle record" is most naturally read to refer to a defendant who obtains such information directly "*from* a motor vehicle record" (or a defendant who uses or discloses that information once so obtained), not a defendant who obtains information that, at some point in time, appeared in a motor vehicle record.

This case might be different if Congress had said what the Plaintiffs assert Congress meant, *i.e.*, that the DPPA protects personal information *derived* from a motor vehicle record, even if a defendant did not retrieve the information directly from such a record. But Congress did not enact such a law. In fact, confirming what the plain text says, Congress considered *and rejected* a version of the statute that would have done exactly what the Plaintiffs believe Congress meant to do.

When first introduced, the DPPA lacked any private cause of action. *See* Driver's Privacy Protection Act of 1993, H.R. 3365, 103d Congress (1993). The first version of 18 U.S.C. § 2724(a) appeared on April 20, 1994, when Representative James Moran offered an amendment that provided, in relevant part: "A person who knowingly obtains, discloses or uses personal information, *derived from* a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information

16

pertains, who may bring a civil action in a United States district court." 140 Cong. Rec. 7911, 7922 (Apr. 20, 1994) (emphasis added) ("the Moran Amendment").

This language found a vehicle in the House's initial version of the Violent Crime Control and Law Enforcement Act of 1994, which included the DPPA as modified by the Moran Amendment. *See* 140 Cong. Rec. 8112, 8142, 8193 (Apr. 21, 1994). But the House and Senate could not immediately agree on the wide-ranging crime bill's text. Thus, the bill went to a conference committee, which excised the word "derived." *See* 140 Cong. Rec. 20702, 20867 (Aug. 10, 1994) (conference committee version). Both chambers agreed to the conference committee's version, and the President signed the DPPA into law — without "derived." *See* Pub. L. No. 103-322, § 300002, 108 Stat. 1796, 2101 (1994).

In light of this history, we must disagree with those courts that have held that if a piece of personal information can be traced back to a motor vehicle record, "the DPPA protects the information throughout its travels." *Pavone v. Law Offices of Anthony Mancini, Ltd.*, 118 F. Supp. 3d 1004, 1007 (N.D. Ill. 2015) (quoting *Whitaker v. Appriss, Inc.*, 2014 WL 4536559, *4 (N.D. Ind. Sept. 11, 2014)); *see also Wilcox*, 360 F. Supp. 3d at 1146. If that were the case, why delete "derived"? We cannot simply assume that Congress made this change for no particular reason.[9] To the contrary, "[f]ew principles of

---

[9] Nor can we assume that Congress thought that "from" and "derived from" mean the same thing. And indeed, as a matter of ordinary English, they do not. If you needed flour, eggs, and milk to bake a cake, you might say you purchased ingredients "derived from" wheat, hens, and cows. But you probably would not say that you purchased ingredients "from" wheat, hens, and cows, because as a general matter, plants and farm animals do not directly engage in the sale of their own wares. In other words, the phrase "derived from" contemplates intermediaries — *e.g.*, the farmer in the cake example, or the accident report here.

statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442–43 (1987) (quoting *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 392–93 (1980) (Stewart, J., dissenting)); *see also Muniz v. Hoffman*, 422 U.S. 454, 468 (1975) (explaining that statutory text "may not be read isolated from its legislative history and the revision process from which it emerged, all of which place definite limitations on the latitude we have in construing it.").

Thus, the legislative history clarifies the plain text:  the DPPA imposes civil liability only on a defendant who obtains personal information *from* a motor vehicle record, but not on a defendant who merely obtains personal information that can be linked back to (*i.e.*, derived from) such a record.  The district court properly rejected the Plaintiffs' contentions to the contrary.

C.

Next, the Plaintiffs argue that a DMV database is or contains "motor vehicle record[s]," such that "the name and address" on a driver's license, and thus on an accident report, "originate from the DMV" database.  *Garey* Pls'. Br. at 36, 42; *Hatch* Pls'. Br. at 30–31, 35.  A DMV database may well constitute or contain a "motor vehicle record."  But there is no allegation that the Defendants accessed a DMV database, as has occurred in other cases.  *See, e.g.*, *Maracich*, 570 U.S. at 52 ("Respondents are trial lawyers . . . [who] obtained names and addresses of thousands of individuals *from the South Carolina DMV* in order to send [attorney solicitation materials]." (emphasis added)).  Instead, the

18

Defendants obtained accident reports from local law enforcement agencies or private data brokers. So regardless of whether a given DMV database is or contains "motor vehicle record[s]," the Defendants here did not "obtain" any information "from" such a database.

D.

The Plaintiffs have one final theory as to the identity of the "motor vehicle record" in this case "from" which the Defendants obtained personal information: the accident report itself. This presents a difficult question. On the one hand, there is a non-frivolous textual argument that an accident report is a "record that pertains to a motor vehicle operator's permit," because the report indicates whether a driver's address is the same as that shown on their license. § 2725(1). Indeed, a district court in our circuit recently held that the exact same kind of accident report at issue here is a "motor vehicle record" within the meaning of the DPPA. *See Gaston v. LexisNexis Risk Sols., Inc.*, 483 F. Supp. 3d 318, 336–37 (W.D.N.C. 2020). On the other hand, several courts have limited a DPPA "motor vehicle record" to those documents held by a state DMV, which would exclude the accident reports in question. *See, e.g.*, *Andrews*, 932 F.3d at 1259–60; *Fontanez v. Skepple*, 563 F. App'x 847, 849 (2d Cir. 2014) (unpublished) (summary order); *Siegler v. Best Buy Co. of Minn., Inc.*, 519 F. App'x 604, 605 (11th Cir. 2013) (unpublished) (per curiam). We need not and do not reach this question, because the Plaintiffs have failed to preserve this argument.

"It is well established that this court 'does not consider issues raised for the first time on appeal,' 'absent exceptional circumstances.'" *Hicks v. Ferreyra*, 965 F.3d 302, 310 (4th Cir. 2020) (alterations omitted) (quoting *Robinson v. Equifax Info. Servs., LLC*,

19

560 F.3d 235, 242 (4th Cir. 2009)).  "Rather, 'when a party in a civil case fails to raise an

argument in the lower court and instead raises it for the first time before us, we may reverse

only if the newly raised argument establishes "fundamental error" or a denial of

fundamental justice.'"  *Id.* (alterations omitted) (quoting *In re Under Seal*, 749 F.3d 276,

285 (4th Cir. 2014)).  "This rigorous standard is an even higher bar than the 'plain error'

standard applied in criminal cases, and the burden is on the party who has failed to preserve

an argument to show that the standard is met."  *Id.* (internal citation omitted).  Neither set

of Plaintiffs comes close to meeting this standard, but because this is another instance in

which the cases before us differ slightly, we again deal with them separately.[10]

1.

We begin with the *Garey* Plaintiffs, who not only failed to preserve this argument,

but affirmatively disavowed it before the district court.  *See Garey* Pls'. Br. in Resp. to

Defs.' Mots. to Dismiss Pls'. First Am. Compl. and Br. of *Amici Curiae* at 24 ("Defendants

begin by setting up a straw man argument:  accident reports are not DMV records.

Plaintiffs do not contend otherwise." (citations omitted)).  And the district court took the

*Garey* Plaintiffs at their word.  *See Garey* Summ. J. Ord. at 18 ("There are no allegations

---

[10] Even if the Plaintiffs had timely raised before the district court the argument that an accident report qualifies as a "motor vehicle record," their attention to this argument in their opening appellate briefs borders on a "passing shot at the issue," *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) (citation omitted), which would likely constitute waiver.  *See Garey* Pls'. Br. at 43 (arguing in a conclusory fashion that "[s]ince that [accident] report itself (or, at a minimum the Driver's address on that report) is a motor vehicle record, and since the [Defendants] obtained each Driver's address from such a report, the [Defendants] obtained the Drivers' information 'from a motor vehicle record.'"); *Hatch* Pls'. Br. at 36 (same).

that the accident reports are 'motor vehicle records' under the DPPA.").  After losing on summary judgment, the *Garey* Plaintiffs forthrightly acknowledged in their brief in support of their Rule 54(b) motion that they had "fundamentally altered [their] position on whether a North Carolina DMV-349 accident report is, itself, a 'motor vehicle record' under the" DPPA.

The district court rejected the *Garey* Plaintiffs' effort to reverse course, reasoning that the "Plaintiffs had several chances to make the straightforward contention that DMV-349s were in fact motor vehicle records and chose not to do so."  Not only was this a plainly proper reason to deny the Rule 54(b) motion, but the *Garey* Plaintiffs did *not* appeal that denial.  Considering arguments in a civil case for the first time on appeal requires an extraordinarily compelling reason to do so.  Here, the procedural history provides extraordinarily compelling reasons *not* to do so.

2.

For their part, the *Hatch* Plaintiffs did not go so far as to label as a "straw man" the argument that an accident report is the "motor vehicle record" from which the Defendants obtained personal information.  They simply failed to raise that contention in the district court.  Instead, the *Hatch* Plaintiffs asserted in their summary judgment briefing that the "Plaintiffs' information came from a motor vehicle record," even if the Defendants did not obtain that information *from* such a record.  After losing on summary judgment, the *Hatch* Plaintiffs moved under Rule 54(b), nominally to revise the district court's summary judgment order.  But the *Hatch* Plaintiffs' 54(b) motion really sought to revise their summary judgment briefing.  They contended that they had "in substance" argued that

21

accident reports constitute "motor vehicle records," because "there is no principled distinction between . . . [the argument that] the entire DMV-349 is a DPPA motor vehicle record, and the argument of Plaintiffs [in their summary judgment briefing] that the addresses of the Plaintiffs on DMV-349s . . . constitute DPPA motor vehicle records."

The district court declined to revisit its prior decision, holding that the *Hatch* Plaintiffs had "fail[ed] to rebut the Court's original statement" that "there are no allegations that the accident reports are 'motor vehicle records.'"  The court did not err in doing so. Depending on how one interprets the *Hatch* Plaintiffs' summary judgment briefing, they either presented the 'derived from' theory (which we have already discussed) or argued that an address, which the DPPA defines as the kind of "personal information" found in a "motor vehicle record," *see* § 2725(3), is also a "motor vehicle record" unto itself.  Neither is an argument that an accident report is itself the "motor vehicle record" from which the Defendants obtained personal information.  And in any case, as in *Garey*, the *Hatch* Plaintiffs did not appeal the district court's denial of their Rule 54(b) motion.

Thus, neither set of Plaintiffs has met their heavy burden of convincing us to consider for the first time on appeal their argument that an accident report is a "motor vehicle record."

## IV.

Our holding today is narrow and straightforward.  The district court correctly held that the Plaintiffs have standing to seek damages, but not prospective relief.  On the merits, the DPPA imposes civil liability only on "[a] person who knowingly obtains . . . personal information, from a motor vehicle record," or one who uses or discloses personal

22

information so obtained.  § 2724(a).  That means what it says:  a DPPA plaintiff must allege and prove that the defendant obtained the plaintiff's personal information "*from* a motor vehicle record." *Id.* (emphasis added).

Given that holding, we must affirm.  Whether or not driver's licenses or DMV databases constitute "motor vehicle record[s]" (questions on which we take no position), the Defendants did not obtain the Plaintiffs' personal information *from* licenses or DMV databases.  The Defendants obtained the Plaintiffs' personal information from accident reports — but the Plaintiffs failed to preserve the argument that those accident reports are "motor vehicle record[s]."  Therefore, the judgment of the district court is

*AFFIRMED.*